

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| WILLIAM R. GRONEMAN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Case No: 06 C 0523 |
| v. | ) Magistrate Judge Cole |
| | ) |
| JO ANNE B. BARNHART, | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

### MEMORANDUM OPINION AND ORDER

The plaintiff, William Groneman, seeks review of the final decision of the Commissioner ("Commissioner") of the Social Security Administration denying his applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 423(d)(2); 1382c(a)(3). Mr. Groneman asks the court to reverse and remand the Commissioner's decision, while the Commissioner seeks an order affirming the decision denying Mr. Groneman's applications. For the reasons stated below, the plaintiff's motion is granted, and the Commissioner's motion is denied.

### I.
### PROCEDURAL HISTORY

Mr. Groneman applied for Disability Insurance Benefits ("DIB") on April 11, 2003, and on March 20, 2003, protectively filed an application for Supplemental Security Income ("SSI"), alleging that he had been unable to work since February 4, 2003. (Administrative Record ("R.") at 15). The Social Security Administration denied his application at both the initial level of administrative review (R. at 28–32) and upon

reconsideration. (R. at 34–37). On March 26, 2004, Mr. Groneman filed a timely request for a hearing before an Administrative Law Judge ("ALJ"). R. at 38–38A). On March 16, 2005, the ALJ conducted a hearing at which Mr. Groneman, represented by counsel, appeared and testified. (R. at 533–65). Mr. Groneman's mother also testified. (R. at 532, 550-552). In addtion, Dr. Carl Leigh testified as a medical expert, and Cheryl Hoiseth testified as a vocational expert. (R. at 552–65). In a decision dated May 6, 2005, the ALJ found that Mr. Groneman was not disabled because he retained the ability to perform at least sedentary to light work and there were a significant number of jobs in the economy that he could perform. (R. at 12–21). This became the final decision of the Commissioner when the Appeals Council denied Mr. Groneman's request for review of the decision on December 9, 2005. (R. at 6–9).

## II.
## EVIDENCE OF RECORD

Mr. Groneman was born on December 7, 1958, making him forty-six years old at the time of the ALJ's decision. (R. at 15). At the hearing, he testified that he weighed 156 pounds, but that he had lost a lot of weight – his normal weight was about 195 pounds. (R. at 542). He completed his GED. (R. at 15). Mr. Groneman has worked as a printing press operator, a die setter, an appliance delivery truck driver, and a truck driver. (R. at 74).

At the time of the hearing, Mr. Groneman had filed two workers' compensation claims, with one still pending. (R. at 536). The first claim arose from a double hernia he suffered in April or May of 2002 while moving heavy bins with a manual hand truck.

(R. at 535–36). The second claim arose from a bone bruise he received in December of 2002 when he slipped in the back of his truck while pulling a cart and fell on his hip. (R. at 536). He also apparently has a potential medical malpractice claim – he testified that his "back snapped" when a doctor was treating him – that was still in its investigatory phase at the time of the hearing. (R. at 537–38).

Mr. Groneman's past relevant work history, from March 1988 through February 2003, includes jobs as a printing press operator, die setter, appliance delivery truck driver, and truck driver. (R. at 74). From March 1988 until October 1992, he worked as a printing press operator, which involved setting type, setting up the machine, and frequently lifting 50 pounds. (R. at 75). From December 1992 until July 1999, he worked as a die setter for three different organizations. (R. at 74). As a die setter, he put dies into a machine, locked it down, checked tolerances, and frequently lifted between 25 and 50 pounds. (R. at 76–78). As an appliance delivery truck driver from October 1999 through July 2000, he drove a truck and delivered washers, dryers, refrigerators, and dishwashers. (R. at 79). He frequently lifted 50 pounds or more with the aid of a dolly and the assistance of another deliveryman. (R. at 79). Finally, from December 2000 until February 2003, he was a truck driver, delivering steel. (R. at 74, 80). In that job, he had to load and unload bins containing up to 4,000 pounds of steel, with the aid of a hand truck. (R. at 80). Although he often asked for assistance in moving the steel, he was usually denied any help. (R. at 80).

In connection with his application for DIB and SSI, Mr. Groneman completed questionnaires regarding his daily activities and the manner in which his impairments

3

affected him. (R. at 82–86). Mr. Groneman indicated that daily chores, such as preparing a meal, dressing, and bathing were difficult for him. (R. at 82). In particular, he had a hard time standing or sitting for long periods of time, could not bend, and would lose his balance. (R. at 82). Moreover, he could not carry more than 20 pounds without pain, could not lift anything above his waist without severe pain, and feared for his safety when carrying items up and down the stairs. (R. at 82). Getting in and out of a car was difficult for Mr. Groneman, as was driving for long periods of time because being in one position was very uncomfortable for him. (R. at 84). He also stated that he could not sit for extended periods of time without pain, indicating the longest he could sit was between 5 and 30 minutes. (R. at 84). Finally, he claimed to suffer from pain, fatigue, nausea, and dizziness, which would force him to lie down. (R. at 84).

As for chores, Mr. Groneman claimed in his questionnaire that he tried to accomplish chores such as cleaning, making the bed, or doing laundry, but often could not finish the task until later on due to severe pain. (R. at 86). He answered that he would mow the lawn once a week with a riding mower, but sometimes could not finish owing to his pain and nausea. (R. at 86). Finally, he stated that his pain made him unable to play with his daughter and teach her things like riding a bicycle or camping like he used to do. (R. at 86). All of the pain, Mr. Groneman wrote, caused him to become severely depressed. (R. at 85).

As for medications, Mr. Groneman stated at the hearing that he was not taking them because he could not afford them because he had no medical coverage and no income. (R. at 538). He applied for public aid, but had been turned down. (R. at 538).

4

Mr. Groneman admitted that he smoked a pack of cigarettes every two days, but stated that smoking had no adverse effect on his breathing. (R. at 539). Mr. Groneman summarized the reasons for his inability to work as follows:

> I get fatigued real easy. The body pain that I have is probably a ten. My back, I have lot of problems with my back feeling like it's falling from one side to the other, not forward or backwards, just side to side. I've got constant nausea all the time, where the more active I am, the more the nausea gets me, and kind of, you know, unless I calm my body down, it gets worse, so a lot of times, I spend laying down, relax and meditating. (R. at 540–41).

## A.
## Medical Evidence

In his Disability Report, Mr. Groneman contended that he is unable to work because of constant pain in the groin and rib area, internal pain, constant nausea, headaches, dizziness, leg numbness, and pain shooting through his testicles and stomach. (R. at 62). The alleged date for the onset of disability is February 4, 2003. (R. at 71). Mr. Groneman has an extensive medical history and has seen several physicians in a period of two or three years. (*See generally* R. at 109–510).

Mr. Groneman underwent a laparoscopic surgery in May 2002 to repair bilateral inguinal hernias. (R. at 157-159). After the surgery, however, he continued to experience left-side discomfort despite rest and anti-inflammatory medication. (R. at 153). In September 2002, he presented to Dr. Cherala complaining of persistent pain in the left groin and testicular area since the surgery. (R. at 116). Dr. Cherala prescribed two pain killers, Neurontin and Ultram, and recommended a series of left inguinal nerve blocks. (R. at 117). The doctor performed the first block on September 27, 2002, and it resulted in immediate pain relief. (R. at 112). Thereafter, however, Mr.

5

Groneman developed numbness in his left thigh and leg, and his pain increased – he described it as 8 on a scale of 10. (R. at 124, 126, 137, 148).

In November 2002, Dr. Lubenow evaluated Mr. Groneman for his persistent complaints of pain following the May 2002 hernia surgery. (R. at 137). Dr. Lubenow felt that Mr. Groneman had left inguinal neuralgia, a likely neuroma secondary to his surgery, intercostal neuralgia, and left adductor tendonitis. (R. at 138). Dr. Lubenow recommended a series of nerve blocks and perhaps a cryoneurolysis. (R. at 138). Finally, Dr. Lubenow believed that a series of trigger point injections into Mr. Groneman's thigh could help with the adductor tendonitis. (R. at 138). He further felt that Mr. Groneman was "capable of performing modified duties" at that time but that it was too early to determine whether he had a partial or permanent disability. (R. at 138). Dr. Lubenow felt he should not engage in strenuous work activity or heavy lifting until treatment was completed. (R. at 138).

Mr. Groneman also underwent a series of trigger point injections with Dr. Lubenow for pain between his ribs secondary to an old motor vehicle accident in 1995. (R. at 131-137, 145, 455-456). The course of treatment appeared to have been less than successful. An EMG in January of 2003 was abnormal, revealing evidence consistent with femoral neuropathy and left-sided inguinal pain, which was consistent with ilioinguinal neuralgia. (R. at 124, 410-411). Mr. Groneman continued to complain of nausea and "vague physical complaints." (R. at 124). He reported a weight loss of 10 pounds, decreased appetite, and upper abdominal pain. (R. at 124). In Dr. Lubenow's opinion, Mr. Groneman had reached maximum medical improvement. (R. at 124).

6

In March 2003, Mr. Groneman saw Dr. Shoener for follow-up and reported persistent left-sided pain. (R. at 146). Dr. Shoener reported that Mr. Groneman had not tolerated injections well. (R. at 147). The doctor found no indication of recurrent right or left inguinal hernia, but he did find some mild left cord tenderness. (R. at 147). He discussed the possibility of cryotherapy or neurolysis, but only as a last resort. (R. at 147).

On April 9, 2003, Dr. Nesreen Suwan performed a neurological examination. (R. at 126). Mr. Groneman's left knee reflexes were diminished, as was pin-prick sensation in his left thigh and medial aspect of his left leg. (R at 126). His gait was abnormal, and he had difficulty with heel, toe, and tandem walking. (R. at 126). Tinel's sign was positive for irritation of the left ilioinguinal nerve. (R. at 126). Mr. Groneman also exhibited tenderness to palpation of the left inguinal area and bilateral rib cage. (R. at 126).

At about that same time, Mr. Groneman began treatment with a chiropractor, Clare Ollayos, about three times a week. (R. at 300-309; 327-336). Sessions involved therapeutic exercises, chiropractic manipulation treatments, and electrical stimulations. Mr. Groneman also began using a home TENS unit for relief of pain. (R. at 314). The frequency tapered off to about once a week, and then to about every three weeks by mid-2004. (R. 309-311; 336-338). Money and lack of insurance had become an issue by that point. (R. at. 423, 429-430). Mr. Groneman also began seeing a psychotherapist, Amy Beckman-Page, in June of 2003, through a local family services agency, once or twice a week to help him deal with his situation. (R. at 478-479).

On September 2, 2003, Dr. Roopa Karri conducted a consultative examination of Mr. Groneman at the request of the Agency. (R at 167-70). Dr. Karri found that Mr. Groneman had a history of bilateral inguinal hernia, left femoral neuropathy with numbness in the whole left leg with shooting pain from the left lower ribs to the left leg. (R. at 169). He also noted left-sided pain in the groin, testes, and lower abdomen. (R. at 167). Mr. Groneman also complained of diarrhea and his weight was down to 174 pounds. (R. at 167-168). Dr. Karri found deep tendon reflexes to be equal and symmetric, but decreased sensation in the left leg and lower abdomen. (R. at 169). Dr. Karri also noted a history of low back pain with a mildly decreased range of motion, which may have been related to left leg complications. (R. at 169).

That same day, Dr. Allan Nelson performed a consultative psychiatric evaluation. (R. at 163-166). Mr. Groneman related his medical problems, and said he was growing increasingly depressed over them, with frequent crying spells, losses of concentration, insomnia, social withdrawal, and loss of appetite and energy. (R. at 163-164). He reported having lost 35 pounds. (R. at 164). His financial situation also deteriorated and he had to move in with his mother. (R. at 164). Dr. Nelson noted that Mr. Groneman's gait was slow and painful, and that his affect was moderately depressed throughout the session. (R. at 164). He diagnosed Mr. Groneman with adjustment disorder with depressed mood, stemming from his severe physical problems. (R. at 165).

On September 8, 2003, Mr. Groneman went to the emergency room with complaints of chronic pain in the left posterolateral thorax, the lateral abdomen, and in

the left groin and leg. (R. at 178). The treating physician described Mr. Groneman as a "vague historian." (R. at 178). He also noted that Mr. Groneman came to the ER because he wanted a "diagnosis" and brought with him a large stack of medical records. (R. at 178). The physician found "significant discrepancies between the medical records and the patient's story." (R. at 178). Mr. Groneman accounted for the discrepancies by explaining that his doctors were "lying" to cover up their mistakes. (R. at 178). Ultimately, the ER physician diagnosed Mr. Groneman as having chronic thoracic, abdominal, and left groin pain. (R. at 179). Mr. Groneman was encouraged to seek alternative medical therapy and was discharged. (R. at 179).

On September 26, 2003, Dr. M. Naidu, a psychiatrist with the local family services association, performed a psychiatric evaluation. (R. at 501-504). Mr. Groneman related his financial and medical situations: by that time, his workers' compensation settlement had run out, he had no insurance, and had been denied public aid because of the social security benefits his mother received. (R. at 503). Dr. Naidu did not notice that Mr. Groneman walked with a limp, although he complained that he could not "walk straight." (R. at 503). Mr. Groneman was anxious and agitated because of his pain and because he could not get proper care or compensation. (R. at 503). Dr. Naidu's diagnosis was adjustment disorder with depressed mood, and he assessed a GAF score of 55. (R. at 504).

On October 23, 2003, Mr. Groneman again visited an emergency room complaining of chronic pain radiating to the groin. (R. at 207). A CT scan was

recommended, but it is unclear whether one was performed at that time. (R. at 211). He was given Darvocet, and discharged home. (R. at 207-208).

Mr. Groneman returned to the emergency room seeking treatment on November 2, 2003. (R. at 261). He continued to complain of left-sided abdominal pain radiating to his groin, which was sharp and associated with dizziness and nausea. (R. at 261). The ER physician ordered a CAT scan of the abdomen and pelvis. (R. at 262). The CAT scan showed evidence of advanced diverticulosis of the sigmoid colon, but insufficient evidence to show diverticulitis. (R. at 237).[1] Otherwise, the CAT scan of the abdomen and pelvis was negative. (R. at 238). The physician noted that while awaiting the results of the CAT scan, Mr. Groneman fell soundly asleep in the emergency department, requiring the physician to shake him a little to awaken him. (R. at 230). The physician thought that this sound sleep seemed to contradict Mr. Groneman's allegation that his pain was a 9 out of 10. (R. at 230). Thereafter, the physician discharged Mr. Groneman home. (R. at 230).

But Mr. Groneman came back to the hospital later that day reporting worsening abdominal pain. (R. at 231). He stated that he could not eat because he was throwing up a lot. (R. at 231). He also stated that he had been passing blood per rectum. (R. at 231). The physician admitted Mr. Groneman for further consultation with gastroenterology. (R. at 233). Testing and evaluation revealed gastroduodenitis, a

---

[1] Diverticulitis is inflammation of an abnormal pouch (diverticulum) in the intestinal wall, usually found in the large intestine (colon). The presence of the pouches themselves is called diverticulosis. www.mercksource.com.

moderate hiatal hernia, and colon findings consistent with diverticulitis. (R. at 215–16). The physician placed Mr. Groneman on antibiotics and Protonix (for erosive esophagitis). (R. at 216).

Mr. Groneman underwent a colonoscopy on December 17, 2003. (R. at 288). The physician performing the procedure resected a colonic polyp and biopsied some patchy erosions. (R. at 288). The physician diagnosed sigmoid diverticulosis and internal hemorrhoids, and he recommended the patient take a fiber supplement. (R. at 289).

In July 2004, Mr. Groneman saw Dr. Gasser for complaints of low back pain. (R. at 473). Mr. Groneman first saw Dr. Gasser in 1994 after a motor vehicle accident, but had not been back to Dr. Gasser until 2004. (R. at 473). Dr. Gasser confirmed Mr. Groneman was in pain, but could not determine the cause. (R. at 474). He further noted that Mr. Groneman's physical examination was normal but nevertheless he could not work in the future because of chronic pain. (R. at 474). On August 2, 2004, Dr. Gasser warned Mr. Groneman that although he had chronic pain, the Agency was generally critical of such claims and would likely not be sympathetic. (R. at 475). Because of Mr. Groneman's severe depression, Dr. Gasser referred him to a psychiatrist. (R. ar 475). But Mr. Groneman could not afford to go. (R. at 475). Scott Cyphers, therapist from the family services agency, reported on August 9, 2004, that Mr. Groneman suffered from major depressive disorder. (R. at. 478).

On May 23, 2005, Mr. Groneman underwent an MRI of his lumbar spine. (R. at 527). The test revealed mild disc bulging and some narrowing at L3-L4, but no disc

herniation. There was disc bulging, narrowing, marginal osteophytes, and mild anthopathy at L4-L5 and L5-S1.

State agency non-examining physicians assessed Mr. Groneman's residual functional capacity based on the medical record in September 2003 (R. at 196–203) and February 2004. (R. at 290–97). They both determined that Mr. Groneman was capable of occasionally lifting and/or carrying 50 pounds and frequently lifting and/or carrying 25 pounds. (R. at 197, 291). They also both found that Mr. Groneman could stand for 6 hours a day and sit for 6 hours a day. (R. at 197, 291). Finally, they both found that Mr. Groneman had no postural, manipulative, visual, communicative, or environmental limitations. (R. at 198–200, 292–94). On September 25, 2003, a state agency physician reviewed the medical record and determined that Mr. Groneman did not have a severe psychiatric impairment. (R. at 182).

## B.
## Medical Expert Testimony

Dr. Carl Leigh testified as a medical expert at Mr. Groneman's administrative hearing. (R. at 552). Dr. Leigh felt there was sufficient medical evidence in the record for him to form an opinion of Mr. Groneman's medical status. (R. at 554). Dr. Leigh found that Mr. Groneman had left femoral neuropathy with numbness of the entire left lower extremity. (R. at 554). The neuropathy involved pain going into the groin and left lower abdomen. (R. at 555). Dr. Leigh believed Mr. Groneman had some restriction of motion of the lumbosacral spine, flexion 70 degrees, extension 20 degrees. (R. at 555). He found evidence that Mr. Groneman walked with an antalgic gait. (R. at 555). Dr. Leigh found

evidence of chronic obstructive pulmonary disease with diminished breath sounds in both lungs. (R. at 555). The X-ray evidence was consistent with bolus emphysema, or little balloon-like structures and scarring at the top of the upper right lobe of the lungs. R. at 555). He also found evidence in the record of reflex sympathetic dystrophy, which is a pain syndrome. (R. at 555).

Dr. Leigh recognized that Mr. Groneman complained of exertional nausea. (R. at 556). But he felt the only impairment that would explain the nausea is irritable bowel syndrome or diverticuloses with one episode of diverticulitis. (R. at 556). Both of these afflictions are unrelated to musculoskeletal or pulmonary impairments. (R. at 556).

As to the severity of Mr. Groneman's impairments, Dr. Leigh testified that they did not meet or equal the relevant listings. (R. at 556). However, he testified that Mr. Groneman did have some limitations in residual functional capacity. (R. at 556). Dr. Leigh testified that an appropriate residual functional capacity would be occasional lifting and carrying of 20 pounds, and frequently 10 pounds. (R. at 556). He testified that Mr. Groneman could stand and walk between 2 and 4 hours maximum per workday. (R. at 556). He could sit for 6 hours with a sit/stand option at will. (R. at 556). He would be limited to occasional operation of foot controls with the left lower extremity. (R. at 556). He would have to avoid unprotected heights completely, and he could only occasionally stoop, crouch, or crawl. (R. at 556–57). Dr. Leigh testified that Mr. Groneman had no manipulative, visual, or communicative limitations. (R. at 557). And Mr. Groneman would have to avoid hazardous machinery and be limited in his

13

exposure to respiratory irritants. (R. at 557). Finally, Mr. Groneman would have to avoid working on uneven or rough terrain. (R. at 557).

Mr. Groneman's attorney then questioned the medical expert, focusing on Mr. Groneman's pain. Dr. Leigh testified that Mr. Groneman's pain was consistent with his physical conditions, "[n]ot only because of the diagnosis . . . but because of the numerous referrals to chronic pain clinics that his treating sources believe he has significant marked pain." (R. at 557). But, in arriving at his opinion of Mr. Groneman's RFC, Dr. Leigh conceded that he did factor in Mr. Groneman's pain. (R. at 557). When Mr. Groneman's counsel asked Dr. Leigh whether an individual with such pain would be able to work 5 days a week, 52 weeks a year, he said, "I doubt it." (R. at 558).

## C.
## Vocational Expert Testimony

Cheryl Hoiseth next testified as the vocational expert. (R. at 558). Relying on Mr. Groneman's descriptions of his jobs, Ms. Hoiseth labeled his jobs as follows: (1) truck driver would be heavy, semi-skilled; (2) stamping machine die setter would be skilled, heavy work; and (3) printing press operator would be skilled, heavy work. (R. at 562). Ms. Hoiseth testified that none of these jobs imparted skills that would be transferable to a lighter residual functional capacity. (R. at 562). The ALJ described for Ms. Hoiseth a hypothetical worker with the RFC Dr. Leigh described[2] and asked if that hypothetical

---

[2] The ALJ posited an individual 46 years of age; who has a GED education; whose work experience is heavy skilled and unskilled; who is not taking medications; who has left femoral neuropathy stemming from hernia surgery; who has chronic obstructive pulmonary disease; who has had treatments and referrals for pain; who has had diverticulosis and irritable bowel syndrome; who can lift 20 pounds occasionally; who can lift 10 pounds frequently; who can be on his feet between two and four hours per eight-hour workday; who is limited to an occasional foot control with the left foot; who cannot work around unprotected heights; who can only occasionally stoop, crouch, or crawl; who cannot work with hazardous machinery; who cannot (continued...)

worker could work at other jobs. (R. at 562–63). Ms. Hoiseth testified that such a worker would have to work in the sedentary area, which would be sedentary, unskilled work with a sit/stand option. (R. at 563). The only example of such work that Ms. Hoiseth could provide was a hand packager, with approximately 1,000 jobs available. (R. at 563).

When questioned by Mr. Groneman's attorney, Ms. Hoiseth admitted that if a person is absent from work for more than two days a month, he could not sustain employment. (R. at 563–64). She also affirmed that a person who could not stay on task for 90% of his time could not sustain employment. (R. at 564).

## III.
## THE ALJ'S DECISION

The ALJ held that Mr. Groneman was not disabled under the Social Security Act because even with his impairments he could perform a significant number of jobs in the national economy. (R. at 19). The ALJ analyzed the case using the familiar five-step sequential analysis under 20 C.F.R. § 404.1520. (R. at 19–20). The ALJ found that Mr. Groneman satisfied the first step because he had not been working since his alleged onset of disability on February 4, 2003. (R. at 19). At the second step, the ALJ found that Mr. Groneman had severe impairments, in particular "severe residuals of hernia repair, femoral neuropathy, diverticulitis, and chronic pain." (R. at 20). At the third step, however, the ALJ noted that none of these impairments was equivalent to an impairment listed in Appendix 1, Subpart P, Regulations No. 4. (R. at 20). At the fourth step, the ALJ analyzed Mr. Groneman's residual functional capacity. (R. at 20). The ALJ

[2](...continued)
have concentrated exposure to respiratory irritants; and who cannot work on uneven or rough terrain. (R. at 562).

specifically adopted Dr. Leigh's RFC finding and concluded that Mr. Groneman could perform the physical exertional and nonexertional requirements of work except for lifting and carrying over 20 pounds, prolonged walking and standing, performing repetitive activity with the lower-left extremity, and complex skilled work. (R. at 18, 20). The ALJ further found that Mr. Groneman required work with a sit/stand option. (R. at 20).

The ALJ found that Mr. Groneman's testimony was not fully credible. (R. at 20). The ALJ based his finding in light of Mr. Groneman's "minimal treatment and lack of follow through with his medication." (R. at 20). The ALJ also found that at the age of 46 Mr. Groneman was a "younger person" for purposes of 20 C.F.R. § 404.1563. (R. at 20). Finally, because Mr. Groneman has a General Educational Development certificate, the ALJ found that he had the equivalent of a high school education under 20 C.F.R. § 404.1564. (R. at 20).

Putting all these factors together, the ALJ determined that Mr. Groneman was limited to light to sedentary work. (R. at 19, 20). By itself, this determination would direct a finding of not disabled. (R. at 19). However, because of further restrictions, including restrictions on the use of the lower-left extremity and the need for a sit/stand option, the ALJ enlisted the testimony of a vocational expert, Cheryl Hoiseth. (R. at 19). Ms. Hoiseth testified that with his restrictions, Mr. Groneman would be qualified for hand packaging, of which there were 1,000 jobs in the regional economy. (R. at 19). The ALJ concluded that this number of jobs constituted a significant number of jobs in the national economy and therefore directed a finding of not disabled. (R. at 19).

# IV.
# DISCUSSION

## A.
## Standard of Review

The applicable standard of review of the Commissioner's decision is a familiar one. The court must affirm the decision if it is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is such relevant evidence as a reasonable mind might accept to support a conclusion. *Binion v. Charter*, 108 F.3d 780, 782 (7th Cir. 1997), *citing Richardson v. Perales*, 402 U.S. 389, 401 (1971). The court may not "decide facts anew, reweigh the evidence, or substitute its judgment for that of the Social Security Administration." *Binion*, 108 F.3d at 782. Where conflicting evidence would allow reasonable minds to differ as to whether the plaintiff is disabled, the Commissioner has the responsibility for resolving those conflicts. *Id.* Conclusions of law are not entitled to such deference, however, so where the Commissioner commits an error of law, the court must reverse the decision regardless of the volume of evidence supporting the factual findings. *Id.*

Though the standard of review is deferential, the court cannot act as a mere "rubber stamp" for the Commissioner's decision. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). For the court to affirm a denial of benefits, the ALJ must have articulated the reasons for his decision at "some minimum level." *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). This means the ALJ "must build an accurate and logical bridge from the evidence to his conclusion." *Id.* Although the ALJ need not address every piece

17

of evidence, he cannot limit his discussion to only that evidence that supports his ultimate conclusion. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ's decision must allow the court to assess the validity of his finding and afford the claimant a meaningful judicial review. *Scott*, 297 F.3d at 595. The court must remand a case where the Commissioner's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review." *Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 785 (7th Cir. 2003) *quoting Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

## B.
## Five-Step Sequential Analysis

The Social Security Regulations provide a five-step sequential inquiry to determine whether a claimant is disabled:

1. is the claimant currently unemployed;

2. does the claimant have a severe impairment;

3. does the claimant have an impairment that meets or equals one of the impairments listed as disabling in the Commissioner's regulations;

4. is the claimant unable to perform his past relevant work; and

5. is the claimant unable to perform any other work in the national economy.

20 C.F.R. § 404.1520; *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351–52 (7th Cir. 2005); *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004). An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the claimant is disabled. 20 C.F.R. § 416.920; *Briscoe*, 425 F.3d at 352; *Stein v. Sullivan*, 892 F.2d 43, 44 (7th Cir. 1989). A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the claimant is not disabled. 20 C.F.R. § 404.1520; *Stein*, 892 F.2d at 44. The claimant bears the burden of proof through step 4; if it is met, the burden shifts

to the Commissioner at step 5. *Briscoe*, 425 F.3d at 352; *Brewer v. Chater*, 103 F.3d 1384, 1391 (7th Cir. 1997).

## C.

## Analysis

Mr. Groneman poses a single argument in favor of remanding the Commissioner's decision: that the ALJ failed to make a proper credibility finding. The court must afford an ALJ's credibility finding "considerable deference," and overturn it only if "patently wrong." *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006); *Carradine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004). "Only if the trier of fact grounds his credibility finding in an observation or argument that is unreasonable or unsupported . . . can the finding be reversed." *Sims v. Barnhart*, 442 F.3d 536, 538 (7th Cir.2006) (citation omitted). Here, Mr. Groneman claims that the ALJ failed to follow the dictates of SSR 96-7p, one of the Commissioner's rulings, which are binding on all components of the Social Security Administration. *Nelson v. Apfel*, 210 F.3d 799, 803 (7th Cir. 2000).

Under Social Security Ruling 96-7p, the ALJ's determination or decision regarding claimant credibility "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p; *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001). In this regard it is not sufficient for the adjudicator to make a single, conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible." SSR 96-7p;

*Zurawski,* 245 F.3d at 887. It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms. SSR 96-7p; *Zurawski,* 245 F.3d at 887.

Here, the ALJ basically expressed his credibility finding in the type of single, conclusory sentence that neither SSR 96-7p nor the case law allow. He tersely stated in his findings that "[t]he claimant's testimony was not fully credible, and not indicative of an impairment of disabling severity in view of his minimal treatment and lack of follow through with his medication." (R. at 20). Although the ALJ did briefly summarize Mr. Groneman's testimony in the body of his opinion, nowhere did he further develop his credibility finding. The ALJ may have provided a *reason* for rejecting Mr. Groneman's allegations – because he did nto seek treatment and follow through with medication – but he did not provide *reasoning.* Further, the ALJ's stated reason is simply not supported by the record. He has improperly "ground[ed] his credibility finding in an observation or argument that is unreasonable or unsupported," and, accordingly, his finding must be reversed. *Sims v. Barnhart,* 442 F.3d at 538.

After a review of the record, it is impossible to accept the ALJ's characterization of Mr. Groneman's treatment as "minimal." In fact, to call the medical oddysey Mr. Groneman undertook "minimal" is to exhibit the type of logical flaw that the Seventh Circuit has said requires reversal. *Carradine,* 360 F.3d at 756. Mr. Groneman's course of treatment began with surgery to repair a bilateral hernia which, by most accounts, was only partially successful. At first, Mr. Groneman treated the residual pain with anti-inflammatory medication. When that did not work, physicians moved him on to pain

killers. But those, too, were unsuccessful, and Mr. Groneman underwent a series of injections, both for pain in his abdomen and groin and for intercostal pain through his rib cage. These provided immediate relief, but it was short-lived. Worse, one session appeared to do harm rather than good, leaving Mr. Groneman with a loss of sensation in his left leg. An EMG confirmed the failure of these injection treatments and the damage they had perhaps done. At that point in his experience with the medical profession, Mr. Groneman might have been excused from seeking further "treatment." Nevertheless, Mr. Groneman returned to that physician a couple of more times, and the situation was sufficiently frustrating that treatments of "last resort" were discussed.

At least one physician recommended that Mr. Groneman try alternative treatment for his pain, and Mr. Groneman did. He began receiving chiropractic manipulation and electrical stimulation treatments three times a week from April 2003 until about September of that year.[3] He continued treatments through June of 2004, but with decreasing frequency as his medical insurance coverage expired and his money began to run out. In addition, during this time, Mr. Groneman began attending counseling sessions to deal with his pain and the problems it precipitated. Again, these were rather frequent, twice a week at the beginning; tapering off to about once a week after several months. And, like others without health insurance, Mr. Groneman sought treatment in

---

[3] The ALJ makes no mention at all of Mr. Groneman's chiropractor, Clare Ollayos, or his course of treatment. The Commissioner's regulations do not list chiropractors as medical "[s]ources who can provide evidence to establish an impairment," 20 C.F.R. § 404.1513(a) – a stance that is not without controversy. *See Wolfe v. Shalala*, 997 F.2d 321, 327 (7th Cir. 1993). But a chiropractor is listed as an acceptable source to show severity of an impairment and how it affects one's ability to work. 20 C.F.R. § 404.1513(d). As such, courts have considered an ALJ's failure to address chiropractic treatment as reason for rejecting a credibility finding. *See, e.g., Mulvaney v. Barnhart*, No. 05-4439, 2006 WL 2252547, *18 (N.D.Ill. Aug. 3, 2006).

emergency rooms on more than one occasion, including twice in the same day. The ALJ improperly ignored this extensive record of treatment in making his credibility determination. *Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003)(ALJ may not ignore an entire line of evidence that is contrary to his ruling); *Zurawski,* 245 F.3d at 888 (same). This failing alone necessitates a remand of his decision.

The ALJ also improperly based his credibility finding on Mr. Groneman's "lack of follow through with his medication." Certainly, an ALJ may find a claimant's complaints less credible if he is not taking medication, SSR 96-7p; *Schmidt v. Barnhart,* 395 F.3d 737, 747 (7th Cir. 2005); but the ALJ's analysis here – to the extent there was analysis – was far too cursory. Under SSR 96-7p, an ALJ must consider *why* an individual is not taking medication or following a prescribed course of treatment: " . . . the adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek treatment." *See also Ribaudo v. Barnhart,* 458 F.3d 580, 585 (7th Cir. 2006)(ALJ's credibility finding rejected in part because ALJ did not address claimant's explanation for failure to take prescription medication). One such explanation that the ruling specifically sets forth as significant is that "[t]he individual may not be able to afford treatment and may not have access to free or low-cost medical services." Mr. Groneman offered this very explanation at his hearing when questioned by the ALJ, but the ALJ made no mention of this in his credibility finding.

Perhaps the ALJ simply did not believe Mr. Groneman – he did not have to, *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996) – but he had to provide his reasoning, especially given the support provided for Mr. Groneman's explanation throughout the record. There is no dispute

22

that he was unable to return to his former job or type of work, and he was, consequently, receiving no income. His workers' compensation settlement and accompanying insurance coverage ran out. His financial situation forced him to move in with his mother. He applied for and was denied public aid. More than one health-care provider lamented his inability to afford treatment. By failing to address this well-supported explanation, the ALJ failed to adequately articulate his analysis; he failed to provide a "logical bridge" to allow for meaningful review. *Dixon*, 270 F.3d at 1176; *Brindisi*, 315 F.3d at 785. Again, this alone is sufficient to warrant a remand.

One further point merits attention. In determining Mr. Groneman's RFC, the ALJ adopted the opinion of the medical expert, Dr. Leigh. It is true that Dr. Leigh testified that, essentially, Mr. Groneman had the capacity to perform a somewhat limited range of sedentary and light work. But in so doing, he admittedly did not factor in Mr. Groneman's pain. Dr. Leigh indicated that such pain was not only consistent with the medical evidence, but that he "doubt[ed]" it would allow Mr. Groneman to show up to work on a consistent basis. The vocational expert then testified that a person cannot sustain employment if they are absent more than two days a month.

Severe pain alone, even in the absence of objective medical evidence to substantiate it, can be totally disabling. *Carradine*, 360 F.3d at 754. Here, the medical expert testified that Mr. Groneman's pain was consistent with the medical evidence, and when his testimony is combined with that of the vocational expert, it would certainly seem to suggest that Mr. Groneman is disabled. The ALJ did not have to accept this testimony, but he did have to explain why he rejected it. Instead, he did not even discuss it, despite the fact that he "adopted" Dr. Leigh's RFC finding, and relied on the vocational expert's testimony. Again, the ALJ may not simply

ignore a line of evidence that runs contrary to his decision. *Golembiewski*, 322 F.3d at 917; *Zurawski*, 245 F.3d at 888. On remand, such evidence cannot be ignored.

## CONCLUSION

For the foregoing reasons, the plaintiff's motion for reversal and remand of the Commissioner's decision [#20] is GRANTED. The Commissioner's motion to affirm the decision [#23] is DENIED. This case is remanded to the Commissioner for further proceedings consistent with this opinion.

**ENTERED:** _____

UNITED STATES MAGISTRATE JUDGE

**DATE:** 3/9/07